24CA1593 Brown v Chaffee County 08-28-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 24CA1593
Chaffee County District Court No. 18CV30016
Honorable Amanda Hunter, Judge

Alison Brown,

Plaintiff-Appellee,

v.

Chaffee County Board of Review; Miles Cotton, in His Official Capacity as
Chaffee County Planning Manager; and Board of County Commissioners of
Chaffee County,

Defendants-Appellants.

JUDGMENT REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division IV
Opinion by JUDGE MEIRINK
Freyre and Gomez, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced August 28, 2025

Cain & Skarnulis PLLC, Charles J. Cain, Matthew K. Hobbs, Bradley A.
Kloewer, Salida, Colorado, for Plaintiff-Appellee

Sullivan Green Seavy Jarvis LLC, Barbara J.B. Green, Jo Lauren Seavy,
Victoria L. Jarvis, Boulder, Colorado; Lynda J. Knowles, Deputy County
Attorney, Salida, Colorado for Defendants-Appellants

¶ 1    Chaffee County (the County)[1] appeals the district court's order that the County abused its discretion under C.R.C.P. 106(a)(4) by denying Alison Brown's application for a Limited Impact Review (LIR) permit to operate a dog kennel after construing Brown's two properties as one contiguous parcel and determining that Brown failed to meet the applicable standards under the Chaffee County Land Use Code (CCLUC).  The County also appeals the district court's order granting Brown's motion for summary judgment after the court concluded that Brown did not engage in breeding activities as part of the kennel's operation and that there were no disputed issues of material fact to resolve.  We reverse both orders and remand the case with directions.

I.    Factual Background

¶ 2    Brown purchased her first property (Property A) in Chaffee County in May 2014.  She purchased the property "with the intent of maintaining horses and foxhounds to use for foxhunting on

---

[1] Although Chaffee County Board of Review; Jon Roorda, in His Official Capacity as Chaffee County Planning Manager; and the Board of County Commissioners of Chaffee County are nominally distinct defendants, they are represented by the same counsel, filed a single brief, and essentially stand as a unified party.  Thus, we will hereinafter refer to these parties collectively as the County.

public and private lands . . . [and] constructed agricultural buildings to board and maintain horses and foxhounds on the property." Brown also formed a foxhunting club, which she registered with the Masters of Foxhounds Association of America (MFAA).

¶ 3    When Brown purchased Property A, the CCLUC's definition of a kennel focused on the purpose of having animals on a property:

> [A kennel is] [a]n establishment other than a pet shop or veterinary clinic or hospital, in which dogs, cats and other animals are boarded for compensation or are bred or raised for sale purposes. Dogs used as part of an agricultural activity are not included in this definition.

¶ 4    In 2016, Brown submitted a building permit application to construct a residence on Property A. As part of the application process, Brown met with Chaffee County Planning Manager, Jon Roorda,[2] to discuss her application, her plans, and her intended land use. Following their meetings, Brown sent Roorda a summary of their discussions, a site plan, a description of current and

---

[2] Jon Roorda no longer holds this position, but for the purposes of this appeal, when we reference Roorda, we reference him in his former capacity as the Chaffee County Planning Manager.

intended land use, and an explanation that the construction of the structure on the property was related to her land use. In her summary, Brown specified that the kennel was not used "for any commercial purpose such as boarding or breeding dogs for sale."

¶ 5    The County issued Brown's building permit in November 2016. In March 2017, Roorda sent Brown a letter indicating, in relevant part, that she kept a "large number" of dogs for recreational use; the MFAA and the Pet Animal Care and Facilities (PACFA) acknowledged her as a small-scale breeder; and she was operating a kennel under the CCLUC, which required her to apply for an LIR permit. Roorda asked Brown to prepare and submit application materials for an LIR permit to the Chaffee County Planning Commission.[3]

¶ 6    In late May 2017, Brown appealed Roorda's classification of her land use as a kennel. She argued that, at the time, she had not bred any foxhounds on the property, but she intended to breed foxhounds for her personal use as her hounds aged and retired

_____

[3] Roorda sent Brown a second letter in May 2017, which included the same information and urged Brown to submit an application for an LIR.

from hunting. In response, the Planning Manager's staff prepared a report supporting Roorda's classification of Brown's land use as a kennel. The County's Board of Adjustment (BOA) ultimately affirmed Roorda's classification of Brown's land use as a kennel in June 2017.

¶ 7    In July 2017, Brown purchased another property (Property B), which was adjacent to Property A. Shortly thereafter, Brown changed her license category with PACFA from a small-scale breeder to a pet sanctuary, with such a change prohibiting dog breeding on her property.

¶ 8    Then, in November 2017, the CCLUC amended the definition of a kennel. Rather than focusing on the purpose of having animals on a property, the new definition focused on the number of dogs on a property:

> [A kennel is] [a]ny lot, parcel, or tract or structure in which more than seven dogs, six months old or older are bred, or are kept, raised, trained, housed or boarded for longer than two weeks. This definition shall not apply to a properly permitted pet shops [sic] or veterinary hospital.

¶ 9    Around the same time, Brown's residence on Property A was nearing construction, but the County denied her certificate of

4

occupancy based on her violations of the CCLUC for operating a kennel without a permit.

¶ 10     Brown subsequently applied for a temporary camping permit on Property A, which was denied.  Brown also applied for a temporary camping permit on Property B.  The County also denied this application after determining that Property A and Property B were one "parcel" for purposes of the temporary camping permit and the outstanding violations.

¶ 11     In February 2018, the Board of County Commissioners (BOCC) notified Brown that her contiguous parcel violated the CLUCC's amended definition of a kennel, and that, pursuant to Table 2.2 of the then-current CCLUC, she was required to obtain a kennel permit following an LIR.  In September 2018, Brown applied for an LIR permit that would authorize her to kennel twenty-five foxhounds.  After reviewing the application and holding a public hearing, the Planning Commission remained concerned that Brown failed to address several impacts, including noise.  The Planning Commission thus denied the application.  Brown appealed to the BOCC.  After reviewing the evidence and holding a public hearing in

May 2019, the BOCC agreed with the Planning Commission's decision to deny the permit.

## II.  Procedural History

¶ 12    The procedural posture of this case is complex.  In 2017, Brown first filed an appeal under C.R.C.P. 106(a)(4) of the BOA's classification of her land use as a kennel.  While the case was pending, the County amended the CCLUC's definition of a kennel, which rendered Brown's appeal moot.

¶ 13    After the 2017 amendment, the County filed a motion for a preliminary injunction to enjoin Brown's land use under both kennel definitions as well as the CCLUC's definition of an outfitting facility.[4]  The court ultimately issued an injunction pertaining to outfitting, but it clarified that it did not address the constitutional issues with the outfitting ordinance.

¶ 14    In 2018, Brown sought C.R.C.P. 106(a)(4) review of her temporary camping permit application denials.  The court granted Brown's motion and compelled the BOA's administrative review.

---

[4] Article 15 of the Chaffee County Land Use Code (CCLUC) defines outfitting facilities as "[t]he improved structures and facilities related to guiding services for outdoor expeditions, including fishing, camping, biking, motorized recreation and similar."

6

After its review, the BOA denied Brown's appeal and upheld Roorda's interpretation of the amended definition of a kennel as applying to contiguous, commonly owned real property. Brown appealed this determination to the district court in 2019.

¶ 15    Brown was also denied a limited use permit under the amended definition of kennel, which denial she appealed and for which denial she sought declaratory relief under C.R.C.P. 57.

¶ 16    The district court consolidated the cases in April 2020. In March 2023, the court entered its decision on Brown's C.R.C.P. 106(a)(4) motion, holding that the BOA abused its discretion when it determined that Brown's properties were one parcel for the purpose of applying the kennel regulation. The court further held that the BOCC's basis for denying Brown's camping permit was arbitrary and that the BOCC violated Colorado's merger statute, § 30-28-139, C.R.S. 2025. The court also held that the County abused its discretion when it denied Brown's kennel permit for not complying with CCLUC standards and for being inconsistent or incompatible with agricultural land uses.

¶ 17    In August 2024, the district court entered its order on Brown's motion for summary judgment in the declaratory judgment

proceeding, concluding that Brown possessed more than seven dogs prior to the November 2017 amendment of the CCLUC and that Brown had a prior nonconforming use prohibiting the County from enforcing its November 2017 kennel definition against Brown.

### III.    Analysis

¶ 18    On appeal, the County makes three arguments: (1) that the district court improperly granted summary judgment on Brown's C.R.C.P. 57 declaratory judgment claim because C.R.C.P. 106(a)(4) was Brown's exclusive remedy, and, alternatively, there were outstanding issues of material fact yet to be resolved; (2) that the BOA's interpretation of the term "parcel" was reasonable as applied to the CCLUC's definition of a kennel; and (3) that there was sufficient evidence supporting the BOCC's decision to deny Brown's LIR permit to operate a dog kennel.

¶ 19    Issue one pertains to Brown's claim for declaratory judgment under C.R.C.P. 57.  Issues two and three pertain to the district court's order finding that the decision to deny Brown's LIR permit was arbitrary and capricious under C.R.C.P. 106(a)(4).  We address each argument in turn.

### A. Brown's Claims Were Cognizable Under C.R.C.P. 106(a)(4) and C.R.C.P. 57

¶ 20    The County argues that the district court erred by granting summary judgment on Brown's motion for declaratory judgment under C.R.C.P. 57 because C.R.C.P. 106(a)(4) was her exclusive remedy for a quasi-judicial review. We disagree. Brown was free to initiate a proceeding under C.R.C.P. 106(a)(4) or C.R.C.P. 57, as they each have distinct functions.

¶ 21    The purpose of a C.R.C.P. 106(a)(4) motion is to ensure that an administrative body exercising a judicial or quasi-judicial function — like a town board or commission — has not exceeded its jurisdiction or abused its discretion by misapplying existing laws to regulations or specific situations. C.R.C.P. 106(a)(4); *see Friends of the Black Forest Pres. Plan, Inc. v. Bd. of Cnty. Comm'rs*, 2016 COA 54, ¶ 12; *Fire House Car Wash, Inc. v. Bd. of Adjustment for Zoning Appeals*, 30 P.3d 762, 766 (Colo. App. 2001).

¶ 22    In contrast, C.R.C.P. 57 allows courts to declare rights, status, and other legal relations, and is applicable to legislative actions such as municipal ordinances. C.R.C.P. 57(b). Unlike C.R.C.P. 106(a)(4), which is interpreted narrowly, *Brown v. Walker Com., Inc.*,

2022 CO 57, ¶ 1, C.R.C.P. 57 is remedial and should be liberally construed to settle and afford relief from uncertainty and insecurity with respect to legal rights. *Freed v. Bonfire Ent. LLC*, 2024 COA 65, ¶ 11. Although C.R.C.P. 106(a)(4) is the sole remedy for review of a quasi-judicial action, a party may request a declaratory judgment of the same matter if, "in the context of a particular controversy, the remedy afforded by [the C.R.C.P. 106(a)(4)] review would be inadequate." *Collopy v. Wildlife Comm'n*, 625 P.2d 994, 1004 (Colo. 1981).

¶ 23 Here, Brown sought two distinct remedies. First, Brown sought judicial review under C.R.C.P. 106(a)(4) to determine whether the BOCC exceeded its authority or abused its discretion by denying her LIR permit. The district court concluded that the County abused its discretion when it (1) considered Brown's properties as one parcel instead of two in violation of Colorado's merger statute, § 30-28-139, and (2) determined that Brown's kennel was incompatible with the CCLUC's standards for agricultural land uses.

¶ 24 Second, after the County amended the CCLUC's definition of a kennel, Brown filed a declaratory action for prospective relief under

C.R.C.P. 57 to determine whether the County could enforce the CCLUC's amended definition of kennel against her when — as Brown contends — her kennel was a pre-existing, nonconforming land use under the CCLUC's prior definition of a kennel. In the alternative, Brown argued, even if the County could enforce the amended definition against her, her kennel was not subject to the amended definition.

¶ 25    Given the distinct relief Brown sought under C.R.C.P. 106(a)(4) and C.R.C.P. 57 and each proceeding's unique function, we conclude that both were proper. Accordingly, the district court was correct to entertain an action for judicial review under C.R.C.P. 106(a)(4) and one for declaratory judgment under C.R.C.P. 57.

### B.    The District Court Erred by Granting Summary Judgment in the C.R.C.P. 57 Proceeding

¶ 26    The County contends — and we agree — that there are genuine issues of material fact that preclude entry of summary judgment in Brown's favor on the issue of whether she had a pre-existing, lawful nonconforming use of her property.

### 1. Standard of Review and Applicable Law

¶ 27   We review the district court's summary judgment ruling on a declaratory judgment claim under C.R.C.P. 57 de novo. *Ragan v. Ragan*, 2021 COA 75, ¶ 14. Because we apply the same standard as the district court in our review, we must "determine whether a genuine issue of material fact existed and whether the district court correctly applied the law." *City of Fort Collins v. Colo. Oil & Gas Ass'n*, 2016 CO 28, ¶ 9. Summary judgment is a drastic remedy that should be granted only when it is clear that the applicable standards have been met. *Poudre Sch. Dist. R-1 v. Stanczyk*, 2021 CO 57, ¶ 12. C.R.C.P. 56(c) allows courts to consider pleadings, depositions, answers to interrogatories, admissions, and affidavits when determining whether a genuine issue of material fact exists.

¶ 28   Section 38-1-101(3), C.R.S. 2025, prohibits local governments from enacting or enforcing ordinances, resolutions, or regulations that require a nonconforming property use, lawful at the time of its inception, to be terminated or eliminated by amortization. Section

15 of the CCLUC[5] defines a nonconforming use as a "use of land legally existing at the time of enactment of this land use code or lawful amendments to this Code and which does not conform to the regulations of the zoning district in which it is situated or used."

¶ 29    As previously mentioned, the CCLUC's 2014 definition of a kennel did not specify the number of dogs allowed on a parcel. It simply defined a kennel as "[a]n establishment other than a pet shop or veterinary clinic or hospital, in which dogs, cats and other animals are boarded for compensation or are bred or raised for sale purposes."

## 2.    Discussion

¶ 30    The County argues that summary judgment was inappropriate because it was unclear (1) whether Brown had engaged in breeding activities that violated the former CCLUC definition of a kennel and (2) whether Brown's kennel operation was an existing legal land use under the CCLUC's prior definition of a kennel. We agree with the

---

[5] Except as otherwise stated, all references to the Chaffee County Land Use Code (CCLUC) herein are to the CCLUC version in effect on and before May 7, 2019, the date of the final BOCC denial of Brown's permit applications.

13

County that both factual issues were never resolved and that the district court erred by granting summary judgment.

¶ 31    In her motion for summary judgment, Brown highlighted that the 2014 definition of kennel did not hinge on the number of dogs, but instead on whether dogs were boarded for compensation or bred or raised for sale purposes.  While Brown asserted that she did not engage in breeding activities on her properties, the County concluded that Brown violated the CCLUC's definition of a kennel based on the acknowledgment from the MFAA designating Brown as a "breeder of foxhounds" and a letter from Brown's attorney stating that Brown "breeds, raises, and trains hounds on her property."

¶ 32    Based on the parties' conflicting claims regarding Brown's breeding practices, there is a genuine dispute of material fact regarding whether Brown was breeding foxhounds in violation of the CCLUC's 2014 definition of a kennel.

¶ 33    Breeding issue aside, the central concern is whether Brown's kennel operation was lawful under the CCLUC's 2014 kennel definition.  To trigger protections under section 38-1-101 and CCLUC section 4.2, Brown had to establish that her kennel operation was lawful before the 2017 amendment of the CCLUC.

14

*See Giuliani v. Jefferson Cnty. Bd. of Cnty. Comm'rs*, 2012 COA 190 ¶ 23 ("[Section 38-1-101(3)] protects only nonconforming uses that were lawful at the inception or enforcement of a local government's ordinance or regulation."); *Anderson v. Bd. of Adjustment for Zoning Appeals*, 931 P.2d 517, 519 (Colo. App. 1996).

¶ 34    This issue was never resolved. As evidenced in a hearing before the BOA, the County and Brown disagreed over whether her land use was lawful under the 2014 definition of a kennel:

> And then in terms of ex post facto, it, it has to be a legal use at the time for — so to be grandfathered or, or for this particular — for it to be an illegal sort of change [to] the position — for a Government to change a position of somebody's use of their land, their use of land had to have been previously legal. And[] so the County and Dr. Brown disagree over the legality of the prior use.
>
> . . . .
>
> This Board took the position a few years ago that . . . there was a, a violation of the requirement to obtain a Kennel Permit under the old definition. . . . So, the County is taking a position that her prior land use was . . . not . . . in conformance with the [CCLUC].

It remains disputed whether Brown had an existing legal land use.

¶ 35     The parties' disagreements over whether Brown bred foxhounds on her property in violation of the 2014 CCLUC and the County's position that Brown did not possess a lawful nonconforming use both present genuine issues of material fact. Accordingly, the district court erred by granting Brown's request for summary judgment.

### C.     The District Court Erred by Granting Brown's C.R.C.P. 106(a)(4) Motion

¶ 36     The County contends that the district court erred by reversing the County's decision to deny Brown's LIR permit for two reasons. First, the County asserts that the BOA's interpretation of the term "parcel" in the context of the CCLUC's definition of a kennel was reasonable. Second, the County argues that the district court ignored evidence that Brown failed to meet and comply with the CCLUC's standards and restrictions for agricultural use. We agree with both contentions.

#### 1.     Standard of Review and Applicable Law

¶ 37     In an appeal of a C.R.C.P. 106(a)(4) proceeding, the appellate court is in the same position as the district court concerning review of an administrative board's decision. *Ad Two, Inc. v. City & County*

16

*of Denver*, 9 P.3d 373, 376 (Colo. 2000); *Sierra Club v. Billingsley*, 166 P.3d 309, 311 (Colo. App. 2007).  Our review is limited to deciding whether the governmental body's decision was an abuse of discretion, based on the evidence in the record before it, or was made in excess of its jurisdiction.  C.R.C.P. 106(a)(4)(I); *Whitelaw v. Denv. City Council*, 2017 COA 47, ¶ 7.

¶ 38    In conducting our review, we apply a deferential standard, and "we may not disturb the governmental body's decision absent a clear abuse of discretion." *Langer v. Bd. of Comm'rs*, 2020 CO 31, ¶ 13.  "A governmental entity abuses its discretion only when it applies an erroneous legal standard or when no competent evidence in the record supports its ultimate decision." *Id.*  We will only reach this conclusion if the decision was "so devoid of evidentiary support" that the decision was arbitrary and capricious.  *Freedom Colo. Info., Inc. v. El Paso Cnty. Sheriff's Dep't*, 196 P.3d 892, 900 (Colo. 2008).

¶ 39    Land use codes and ordinances "are subject to the general canons of statutory interpretation." *Shupe v. Boulder County*, 230 P.3d 1269, 1272 (Colo. App. 2010) (quoting *City of Colorado Springs v. Securcare Self Storage, Inc.*, 10 P.3d 1244, 1248-49 (Colo. 2000)).

17

When construing a land use code, we first look to the plain language, being mindful of the principle that we presume that the governing body enacting the code meant what it clearly said. *Shupe*, 230 P.3d at 1272. If the code's language is ambiguous, "we give deference to the board's interpretation of the code it is charged with enforcing, and its interpretation will stand if it has a reasonable basis in law and is warranted by the record." *Id.* However, if the board's interpretation is inconsistent with the relevant governing articles, then that interpretation is not entitled to deference. *Id.*

2.      Discussion

¶ 40     In her C.R.C.P. 106(a)(4) action, Brown argued that the County abused its discretion by construing the terms "lot, parcel or tract," as used in the CCLUC's amended definition of a kennel, as one contiguous property as opposed to two distinct lots. We disagree.

a.      The County's Interpretation of "Lot, Parcel or Tract" Was Reasonable

¶ 41     Before the County amended the CCLUC definition of a kennel in 2017, Brown maintained more than seven foxhounds on Property

18

A, which she claims was legal under the prior definition. Brown argues that the amendment was intended to target her kennel operation by limiting the number of dogs she could have. Brown contends that the County abused its discretion by combining her properties into one singular parcel to fit the CCLUC's amended definition of a kennel's description of "[a]ny lot, parcel, or tract," rather than counting her properties separately. Brown asserts that by merging her properties to fit the amended definition of a kennel, the County arbitrarily and capriciously reduced the number of dogs she could have on her properties (without obtaining an LIR permit) from fourteen to seven. She also claims that combining her properties violated her due process rights under the merger statute, § 30-28-139(1), which sets forth the notification and consent process the County must follow when merging "two or more parcels of land for the purpose of eliminating interior lot lines, obsolete subdivisions, or otherwise."

¶ 42    The County interpreted "lot, parcel, or tract" to mean the contiguous tract of land under common ownership rather than focusing on lot lines and boundaries attached to two separate legal tracts. The County claims its interpretation tracks the ordinary

meaning of the terms, and, to the extent the terms are ambiguous, its interpretation was reasonable.

¶ 43    Though the terms "parcel," "lot," and "tract" are used throughout the CCLUC, they are not specifically defined in the CCLUC.  Turning to their ordinary meanings, a parcel is defined, in relevant part, as "a tract or plot of land."  Merriam-Webster Dictionary, https://perma.cc/68ZZ-6M5G.  A lot is defined both as "a portion of land" and "a measured parcel of land having fixed boundaries and designated on a plot or survey."  Merriam-Webster Dictionary, https://perma.cc/WRC6-RR6Z.  A tract is defined as "an infinite stretch of land" or "a defined area of land."  Merriam-Webster Dictionary, https://perma.cc/G39N-H5X7.

¶ 44    Giving "parcel, lot, and tract" their ordinary meanings, Brown's interpretation of Property A and Property B as two properties having distinct boundaries or defined areas of land is logical and reasonable.  Likewise, the County's interpretation of both properties as a single plot of land, portion of land, or infinite stretch of land under common ownership is also rational and reasonable.  Because the terms are susceptible to more than one interpretation, we look to extraneous evidence and give deference to

20

how the County interprets the code it is responsible for enforcing. *See Shupe*, 230 P.3d at 1272.

¶ 45 As evidenced in the hearing transcripts, the BOA discussed at length what parcel meant in the context of the CCLUC in general and with respect to the CCLUC's definition of a kennel. The BOA acknowledged that parcel could refer to a distinct lot, but it maintained that, in many instances, "adjacent lots are treated as a unified, though not merged, property." In these instances, the County focused on either common ownership of properties or the concept that the impacts of the proposed use could not be contained within lot lines. The BOA used the example of a special event to illustrate. Even though the special event might occur on multiple adjoining properties, for purposes of issuing a permit, the County would treat the land as one parcel — not multiple properties — because the impacts of the event, i.e., traffic, safety, noise, and creation of waste, could not be contained to one property but would spread to all the adjoining properties regardless of lot lines or boundaries. Similarly, if multiple properties were owned by the same person or entity, the County treated the properties as one parcel when it applied the rubbish, debris, and weed provisions of

21

the CCLUC because having "junk on a property ha[s] . . . the potential to have negative effects on adjoining property" regardless of property lines.

¶ 46   The BOA's interpretation of a parcel as "contiguous properties having common ownership or control such as those owned by [Brown]" was reasonable and consistent with these other examples the BOA cited wherein it interpreted parcel to mean land under common ownership.  By interpreting parcel in this manner, the BOA ensured that Brown would be responsible for mitigating adverse impacts from noise, waste, traffic, and safety that could not be contained within the lot lines of Property A and Property B.

¶ 47   The BOA also looked to other counties for guidance, including Pueblo County and Lake County, because their land use codes are similar to the CCLUC.  At a hearing, Roorda testified that the Pueblo County Planning and Development Department "would have interpreted contiguous properties under a common ownership in the same manner that [he] did in their interpretation of their definition of a kennel."  While some counties may have interpreted parcel differently, similar and neighboring counties interpreted parcel the same way as Chaffee County, and thus the BOA

22

recognized: "[O]ur interpretation is reasonable.  It's not out of bounds of what is traditionally accepted by other counties."

¶ 48    As required by the case law, we give deference to the BOA's interpretation of the CCLUC and conclude that it properly construed Brown's properties as one parcel when it applied the CCLUC's definition of a kennel.

¶ 49    Brown also asserts that the County's interpretation of the word parcel was contrary to section 30-28-139(1), which sets forth a formal process a county must follow when a "county ordinance, regulation, or resolution provides for the merger of two or more parcels of land for the purpose of eliminating interior lot lines, obsolete subdivisions, or otherwise."  As one commissioner explained during a hearing,

> [T]he [m]erger [s]tatute deals with what is essentially a lot line combination. . . .  [I]t results in two separate parcels being legally treated as one parcel. . . .  The County isn't attempting to do that.  The County still is treating those two parcels or properties as separate lots for purposes of being able to sell.  It's only being treated as a single parcel or tract for purposes of applying the definition of kennel.
>
> . . . .

> [H]istorically[,] there were times before that Statute came into effect that counties were trying to legally combine lots into one lot. And the law that was — is being cited was an attempt to sort of curb that so that a government wouldn't — couldn't do that without consent of the property owners.

The statute requires consent from the property owners because merging two separate properties results in the creation of one legal property. § 30-28-139(2)(a). It further requires counties to file a record with the county clerk and recorder and to assess the merged parcels as one parcel of real property for purposes of levying and collecting property tax. *See* § 30-28-139(3).

¶ 50 The merger statute does not apply because Brown's properties were not legally merged. Instead, Brown's properties were being treated as a unified parcel for the purpose of considering the adverse effects of Brown's proposed kennel and to ensure she mitigated any negative effects consistent with the CCLUC's LIR process. Further, the BOA was clear in its notice of decision that Brown's properties remained separate legal lots.

24

b.  The BOCC's Decision to Deny Brown's LIR Permit Was Appropriate Because Brown Failed to Comply with the CCLUC's Requirements

¶ 51  Under the CCLUC, any kennel operating in a rural zone must have an LIR permit. The CCLUC defines an LIR as

> [a] shortened land use change permit application and review process, described in Article 4, Section 4.2.2. of [the CCLUC],[6] by which the Planning Commission approve permits for uses being allowed on the basis of their limited impact with regard to compatibility with the site and surrounding land and uses, and the adequacy of required services.

"The burden of proof is on the applicant to demonstrate that the proposed land use change satisfies the applicable standards." CCLUC § 1.3.5.B.3.c. The applicant must submit a narrative, vicinity map, site plan, impact analysis, and suitability analysis, as well as a traffic study. *Id.* § 4.2.3.A.1. The CCLUC defines the impact analysis, section 4.6.2.E, as follows:

> The Impact Analysis shall provide a description of the impacts that the proposed land use change may cause, based upon the

---

[6] Article 4 sets forth the administrative process for reviewing a land-use change application. Once the application is submitted, the staff evaluates and reviews the application, then the Planning Commission holds a public hearing and makes a decision, which may be appealed to the BOCC. CCLUC § 4.1.1.

standards that the proposed use must satisfy. The Impact Analysis shall include a complete description of how the applicant will ensure that impacts will be mitigated and standards will be satisfied. The analysis shall consider at a minimum the potential impacts to nearby properties resulting from the project, including but not limited to: safety, water pollution, noise, vibration, smoke, dust, odor, heat, glare; wildfire, flood, or geologic hazard; and visual impact; and propose mitigations to minimize such impacts.

Further, an applicant seeking to operate a kennel must demonstrate compliance with Article 2 and Article 7.

¶ 52 Article 2 of the CCLUC discusses the County's zoning district and use regulations. Applicable here are the rural zoning requirements, which are intended "to allow agricultural uses of any kind and to promote development that enhances the agrarian and rural character of the County." *Id.* § 2.2.3.A. Any development within the rural zone district "should maintain agricultural resources; . . . protect wildlife habitat and corridors; . . . and allow for the continuance of the rural lifestyle." *Id.* CCLUC section 2.2.3.C states, "New non-residential uses in the Rural zone may be required to restrict operating hours, develop landscaping, increase setbacks, or similar mitigation in order to minimize potential

26

impacts on nearby residential uses and to meet the intent and purpose of the Rural zone."

¶ 53 Article 7 of the CCLUC discusses basic preservation standards for all land use permits and requires the proposed land use change to consider the natural environment and mitigate environmental impacts. CCLUC section 7.8.17 provides the County's specific standards for kennels and includes a requirement that all kennels "prevent any sounds in excess of the maximum permissible noise levels for residential zone districts, set forth in C.R.S. 25-12-103 as amended." *Id.* § 7.8.17.A. In addition to noise restrictions, kennels must have an adequate waste disposal system, *id.* § 7.8.17.B.1; and measures in place to protect health and safety and to minimize "vermin infestation, odors, disease hazards and nuisances." *Id.* § 7.8.17.B.2.

¶ 54 Brown applied for an LIR permit to maintain a kennel to "raise, train, and keep twenty-five (25) hound dogs on her Property in five (5) fenced-in kennel areas and a fenced dog park located adjacent to the dog kennels[,] which is used for exercising, training and giving the dogs playtime in a controlled area." Brown represented the following in her application:

(1)  Sound/noise abatement and mitigation efforts were done prior to the application by the placement of the kennel facilities and other structures.

(2)  No additional sound/noise mitigation was proposed in the current application on Brown's property for the kennel facilities.

(3)  The kennels and fencing were not constructed with any sound/noise barriers or materials.

(4)  It is not an option to kennel the hound dogs in indoor kennel facilities.

(5)  It is not an option to kennel or limit the hound dogs' outdoor access at night.

(6)  The hound dogs made the most noise/sound during times of feeding and exercising.

(7)  There are no set hours for exercising the hound dogs.

¶ 55  Several neighboring property owners made nuisance complaints about the noise coming from Brown's dogs and noticed changes in wildlife behavior and patterns after Brown started using her property as a kennel. Community members submitted a sound monitoring report to the BOCC, which noted "several events" that

exceeded the sound limits on multiple occasions. Brown submitted her own report indicating that sound levels never exceeded the sound limits. The County considered both reports.

¶ 56    The County Planning Commission held three public hearings. After these hearings, the County Planning Commission voted 6-0 to deny Brown's LIR application for the following reasons:

(1)    Brown failed to show or propose any sound/noise mitigation to minimize the impacts of the kennel facilities to nearby properties as required by CCLUC §§ 4.6.2 and 7.8.17.A.

(2)    The proposed kennel facilities are inconsistent with the historical and current uses of the nearby properties and would not enhance the agrarian and rural character of the County as contemplated by CCLUC § 2.2.3.

(3)    Brown failed to show or propose any sound/noise mitigation or buffering to mitigate impacts the kennel facilities would have on wildlife habitat areas, such as several nearby properties that have perpetual wildlife conservation easements as contemplated by CCLUC § 7.1.6.

¶ 57    Brown appealed the Planning Commission's decision to the BOCC, which held another public hearing.  Brown testified as to her sound/noise abatement efforts, the noise measurement report she commissioned, the credibility of her neighbors' noise complaints, and the impact of the proposed kennel on neighboring properties and wildlife.  The BOCC also heard testimony from others regarding the kennel's impact on noise, lack of mitigating sound barriers, depreciation of land values, adverse impact on wildlife, the veracity of Brown's noise measurement report, and that the kennel was not consistent with the historical use of the neighborhood.  The testimony further described Brown's reluctance to address her neighbors' concerns.  For instance, multiple neighbors complained about "near constant barking" and the inadequacy of Brown's noise mitigation measures.  However, Brown rejected the sound and noise mitigation suggestions provided by the BOCC and claimed that they were unacceptable for her foxhounds.

¶ 58    At the hearing, the BOCC discussed how the CCLUC was developed "in a general way that encourages or produces compatibility" throughout the community and "allows for the continuance of the rural lifestyle."  Specifically, a new

nonresidential use may be required to engage in mitigation to minimize potential impacts on nearby residential uses to meet the intent and purpose of the rural zone. The BOCC noted that while the kennel's noise and sound propagation were within acceptable limits, the noise remained a high concern for many neighbors who predated the kennel.

¶ 59     Before issuing its decision, the BOCC held a final meeting. During the meeting, the BOCC noted that the proposed facilities were not compatible with the historical and current uses of the nearby properties, and that the proposed kennel would not enhance or promote the agrarian or rural character of the County as contemplated by CCLUC section 2.2.3. The BOCC also expressed concern that Brown did not address, show, or propose adequate noise mitigation to minimize the impact of the proposed kennel facilities.

¶ 60     In a 3-0 vote, the BOCC denied Brown's application for an LIR permit and issued Resolution 2019-42. The BOCC determined that Brown failed to meet CCLUC section 2.2.3.C and section 7.2.3 standards to "minimize potential impacts on nearby residential uses," to "not result in a significant adverse impact to adjacent

land," and to "be compatible with adjacent land uses." The BOCC also concluded that the application did not have a section 4.6.2 impact analysis that demonstrated that adverse noise impacts had been addressed.

¶ 61 Unless there is no competent evidence in the record to support it, we are required to uphold a governmental body's decision in a C.R.C.P. 106(a)(4) action. *Bd. of Cnty. Comm'rs v. O'Dell*, 920 P.2d 48, 50 (Colo. 1996). Here, the BOCC carefully considered Brown's application, analyzed it under the CCLUC's standards, held multiple public hearings, heard from Brown and community members — who both supported and opposed the kennel — and considered two studies conducted on Brown's sound levels. The BOCC's decision is not "so devoid of evidentiary support that it can only be explained as an arbitrary and capricious exercise of authority." *Id.* (quoting *Ross v. Fire and Police Pension Ass'n*, 713 P.2d 1304, 1309 (Colo.1986)). Instead, the record supports the County's decision to deny Brown's LIR permit application based on its conclusion that Brown failed to comply with the CCLUC's LIR permitting standards. Accordingly, the district court erred by

32

holding that the County abused its discretion when it denied Brown's permit.

## D. Appellate Attorney Fees

¶ 62 Brown requests an award of appellate attorney fees and costs under C.A.R. 38(b), which permits an award of attorney fees on appeal if we determine that an appeal is frivolous. *Glover v. Serratoga Falls LLC*, 2021 CO 77, ¶ 70.

¶ 63 We decline Brown's request. She provides no argument supporting her claim for attorney fees under C.A.R. 38(b), and the claims pursued by the County on appeal were not frivolous.

## IV. Disposition

¶ 64 We reverse the district court's orders granting Brown's C.R.C.P. 106(a)(4) motion and granting Brown summary judgment in the C.R.C.P. 57 proceeding. We remand the case with instructions to (1) reinstate the final decisions of the BOCC and the BOA with respect to the C.R.C.P. 106(a)(4) proceeding, and (2) resume the C.R.C.P. 57 action, the outcome of which may be dispositive of the C.R.C.P. 106(a)(4) proceeding.

JUDGE FREYRE and JUDGE GOMEZ concur.